UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| United States of America ex rel.<br>CORTEZ JONES, R26113,<br><br>      Petitioner,<br><br>      v.<br><br>LEONTA JACKSON, Warden,<br>Western Illinois Correctional Center,<br><br>      Respondent. | No. 08 C 4429<br>Judge James B. Zagel |

## MEMORANDUM OPINION AND ORDER

In a Memorandum Opinion and Order dated September 2, 2010, I held that, although Petitioner's ineffective assistance of counsel claim was procedurally defaulted, Petitioner may be able to establish the miscarriage of justice exception to procedural default. I then ordered an evidentiary hearing as to Petitioner's procedural claim of actual innocence. *See also Schlup v. Delo*, 513 U.S. 298, 341-42 (1995). I assume the reader's familiarity with the facts as set forth therein.

An evidentiary hearing was held on August 20, 21, and 22, 2013. On the basis of that hearing, my review of the record, and the parties' submissions, I conclude that Petitioner has satisfied the miscarriage of justice exception, and a merits-review of his otherwise defaulted claim of ineffective assistance of counsel is justified. I further concluded that 28 U.S.C. § 2254(d)(1) and 28 U.S.C. § 2254(a)(1) are satisfied, and the petition for a writ of habeas corpus is hereby granted.

## BACKGROUND

In the late morning or early afternoon of September 12, 1999, a second-floor apartment at 6102 South May Street in Chicago was robbed. Corey Grant and Michella Anderson were residents of the apartment and were present when the invasion occurred. Three men wearing masks, one wielding a baseball bat, broke in and assaulted Corey Grant. They stole jewelry, a bag of marijuana, and $200 in cash.

Shortly thereafter, Michael Stone and Felicia Anderson, who also resided at the apartment, returned home from a visit to the store. Felicia Anderson was Corey Grant's fiancée, and Michael Stone, Felicia Anderson and Michella Anderson were all cousins. They were informed of the home invasion and robbery. Michael Stone then contacted his half-brother, Michael Carter, to tell him what had happened.

Petitioner Cortez Jones was near his parents' home at 6501 South Emerald in Chicago and on his way to run an errand for his mother when Michael Carter, a friend of several years, approached him by car. The two men had a conversation, and Mr. Carter, who was upset, told Petitioner Jones about the robbery. Petitioner Jones joined Mr. Carter in the car, and the two men drove to the apartment at 6102 South May. At the apartment, Petitioner Jones was introduced to Felicia Anderson and Cory Grant, and the robbery and home invasion was discussed further.

Cortez Jones testified that Michael Carter and Felicia Anderson told him that they believed Friday Gardner was involved in the robbery. Friday Gardner frequently stayed with Rene Phillips, who lived across the hall from the apartment at issue at 6102 South May. Petitioner did not appear to me to be entirely clear as to the basis for their belief. Felicia Anderson and Michael Carter asserted only that they assumed it had to have been someone from

the neighborhood.

Felicia Anderson testified that she learned of the theory that Friday Gardner was involved in the robbery from Michella Anderson.  Michella Anderson testified that she heard the theory from Michael Carter.

Michael Carter and Michael Stone both testified that Petitioner was the first person to implicate Friday Gardner.  Messrs. Carter and Stone asserted that Petitioner told them that, while purchasing marijuana earlier that day, he overheard the seller say that he had just committed a robbery at 61st Street and May.  Messrs. Carter and Stone asserted that, later that day, Petitioner identified Friday Gardner as that man.  Petitioner denies this.

Friday Gardner kept a van parked on the street outside of the apartment building.  All of the above individuals, save Petitioner, assert that, sometime after Petitioner and Michael Carter arrived at the apartment, the two men broke into the van and stole its radio.  It appears this was done in an effort to lure Mr. Gardner out into the street.  Petitioner denies that this happened.

Petitioner and Michael Carter then left the area.  Later, around nine or ten o'clock in the evening, they returned to 6102 South May, apparently because Michael Stone had paged Michael Carter, though there is conflicting testimony as to whether the two men actually spoke.  They found Friday Gardner out in the street by his van, discussing his stolen radio with several friends.

Petitioner Jones and Mr. Carter approached Mr. Gardner, and a heated argument ensued, drawing the attention of several neighbors.  Mr. Stone, who was up in his apartment, heard the argument outside his window.  Mr. Stone then went down to his basement, where he kept a .380 caliber pistol. He retrieved the weapon, and walked outside to continue watching the argument from the alley.

Mr. Stone watched from the alley as the argument continued, when he asserts that he saw Mr. Gardner draw a pistol. No firearm was found on Mr. Gardner's person, though there is some testimony that someone removed a gun from Mr. Gardner's hand after the shooting. In any event, Mr. Stone admits to then drawing his .380 caliber pistol, stepping out from the alley, and firing at Mr. Gardner three times. Mr. Gardner was found dead at the scene with two .380 caliber bullets in his abdomen. Three .380 caliber shell casings were found near his body. The pistol was never recovered.

Mr. Stone, Mr. Carter and Petitioner all ran after the shooting. Mr. Carter and Petitioner were arrested in connection with the shooting the next day, and Mr. Stone turned himself in the day after that. In his statement to the police, Mr. Stone admitted to shooting Mr. Gardner with a .380 caliber pistol, asserting that he did so in defense of his brother. Mr. Stone, Mr. Carter and Petitioner were each indicted in state court. Mr. Stone and Mr. Carter were tried jointly before a jury; Petitioner received a bench trial. Mr. Stone and Mr. Carter's joint jury trial concluded first.

Two eyewitnesses testified in state court at Petitioner's trial for murder that they saw Mr. Stone come out from the alley, and that he, and no one else, shot Mr. Gardner.

Two other eyewitnesses testified at Petitioner's trial that they saw Petitioner Jones shoot Mr. Gardner. A third said he believed Petitioner was holding a gun inside his coat pocket. A police report stated that on the night of the incident this third witness told police that he saw Mr. Stone come out from the alley and shoot Mr. Gardner. The witness denied having made that statement when he later testified at Petitioner's bench trial. A witness who was not called at Petitioner's trial, but testified at the evidentiary hearing, said that he saw Petitioner holding a gun, but did not see him fire. Still another witness appears to have thought that Mr. Carter shot

4

Mr. Gardner.[1]

Forensic evidence did not indicate a shooting at close range. No additional shell casings were recovered.

## DISCUSSION

A federal court may only grant a writ of habeas corpus when a petitioner demonstrates that he is "in custody in violation of the Constitution or law or treaties of the United States." 28 U.S.C. § 2254(a); *Moffat v. Gilmore*, 113 F.3d 698, 702 (7th Cir. 1997). A habeas petition on behalf of a person in custody pursuant to a judgment of a state court cannot be granted unless the decision of the state court was "contrary to or involved an unreasonable application of clearly established Federal law" or was "based on an unreasonable determination of the facts." 28 U.S.C. § 2254 (d)(1-2).

The claim at issue here is the ineffective assistance of Petitioner's counsel at trial. In the September 2, 2010 Order, however, I concluded that Petitioner's ineffective assistance of counsel claim was procedurally defaulted.

**A. Procedural Default and Petitioner's Procedural Claim of Innocence**

A petitioner's claim may be procedurally defaulted if "that claim was presented to the state courts and the state-court ruling against the petitioner rests on adequate and independent state-law procedural grounds." *Perruquet v. Briley*, 390 F.3d 505, 514 (7th Cir. 2004) (citing *Coleman v. Thompson*, 501 U.S. 722, 735 (1991)). A state law ground that provides the basis for a state court decision is independent when the court actually relied on the procedural bar as an

---

[1] This witness was Felicia Anderson, who appears to have run from the scene upon witnessing the shooting exclaiming "Junior shot him, Junior shot him!" Michael Carter appears to have been commonly known as Junior, while Michael Stone was commonly known as Man. It is worth noting that Felicia Anderson testified that Michael Stone's nickname was Junior in addition to Man, but she, in any event, also testified that she did not, in fact, see Michael Carter shoot Friday Gardner. At no point did Felicia Anderson say that she saw Petitioner shoot Friday Gardner.

5

independent basis for its disposition of the case." *U.S. ex. rel. Bell v. Pierson*, 267 F.3d 544, 556 (7th Cir. 2001) (citation omitted). A state law ground is adequate when it is a "firmly established and regularly followed state practice" at the time it is applied. *Franklin v. Gilmore*, 188 F.3d 877, 882 (7th Cir. 1999).

Here, with respect to his ineffective assistance of counsel claim, Petitioner failed to meet the state procedural requirement, codified in the Illinois Post-Conviction Hearing Act, 725 ILL. COMP. STAT. 5/122-2, that post-conviction petitioners attach affidavits, records, or other evidence supporting its allegations or that petitioners state why the supporting documents are not attached. In his post-conviction petition, Jones did attach a segment of the transcript from Michael Stone's trial, in which Stone admitted to shooting Gardner three times. (Pet. for Post-Conviction Relief, 3-4.) However, the Illinois Appellate Court found this trial transcript insufficient because it was "unsupported by an affidavit from codefendant Stone indicating he would have been willing to testify or what the substance of the testimony would have been." *People v. Jones*, No. 1-05-1212 at 6 (Ill. App. Ct. Sep. 26, 2006). The court stated that the absence of such an affidavit "alone justifie[d] the summary dismissal of defendant's petition." *Id*.

Petitioner's failure to attach an affidavit from Stone stating he would be willing to testify was an independent procedural basis for the disposition of the case. Because Illinois courts routinely invoke the procedural requirement that post-conviction petitions attach any necessary supporting affidavits, the basis for dismissal was also adequate. "Illinois courts routinely dismiss claims for post-conviction relief that lack support in the record or supporting affidavits for the proposition that the petitioner's constitutional rights have been violated." *Spreitzer v. Schomig*, 219 F. 3d 639, 647 (7th Cir. 2000).

6

A federal court may excuse a procedural default, however, if a petitioner either (1) shows cause for the default and prejudice arising from failure to review the claims, or (2) demonstrates that failure to review the claims on procedural grounds would result in a fundamental miscarriage of justice. *See Coleman*, 501 U.S. at 750; *Perruquet*, 390 F.3d at 514. In the September 2, 2010 Order, I concluded that Petitioner had not shown cause for the default. I allowed, however, that Petitioner may be able to satisfy the fundamental miscarriage of justice exception.

The fundamental miscarriage of justice exception requires "the habeas petitioner to show that a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Smith v. McKee*, 598 F.3d 374, 387-88 (7th Cir. 2010) (quoting *Schlup*, 513 U.S. at 327 (1995)). As noted above, on August 20, 2013, a limited evidentiary hearing as to the issue of Petitioner's actual innocence was held.

To credibly claim that a constitutional violation has probably resulted in the conviction of one who is actually innocent, a petitioner must "support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 324. The petitioner must then show that it is "more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Schlup*, 513 U.S. at 327.

To that end, there is a crucial distinction between, on the one hand, the burden carried by a petitioner making a substantive claim of innocence, and, on the other, the burden at issue here – the burden carried by a petitioner making a procedural claim of innocence. *See id*. at 313-14. In the case of a substantive claim of innocence, the petitioner does not assert any constitutional error in his or her trial, other than the claim that an innocent person was convicted, and punishing

7

an innocent person would violate the Eighth Amendment. In such a case, an "extraordinarily high" standard of review is appropriate. *Id*. at 315-16. The claim fails unless the federal habeas court is itself convinced that the new evidence unquestionably establishes the petitioner's innocence. *Id*. at 317.

In the case of a procedural claim of innocence, by contrast, the petitioner seeks to establish innocence for purposes of enabling a court to review the merits of an otherwise defaulted claim of constitutional error at trial. *See id*. at 316. Here, the burden is not quite so severe. *Id*. A procedural claim of innocence is satisfied where the habeas court is merely convinced that the new evidence raises sufficient doubt about the petitioner's guilt to undermine confidence in the result of the trial without the assurance that that trial was untainted by constitutional error. *See id*. at 317. Under such circumstances, a merits-review of the otherwise defaulted claim(s) of constitutional error is justified. *Id*.

It is the difference, in other words, between requiring the new evidence to be so strong as to put the petitioner's guilt in such question as to render the conviction unconstitutional *even if* it was the product of an otherwise fair trial, versus requiring the new evidence to be only so strong as to put the petitioner's guilt in such question as to render the conviction unconstitutional *unless* it was the product of a fair trial. *See id*. at 316.

To apply this standard to a petitioner's procedural claim of innocence, a court must assess the probative force of the newly presented exculpatory evidence against the evidence of guilt adduced at trial. *See id*. at 331-32; *see, e.g., Smith*, 598 F.3d at 387-88. Here, the principal new evidence is Michael Stone's testimony. Michael Stone claims that he, and he alone, shot Friday Gardner.

Pointing to inconsistencies with Petitioner's testimony and the testimony of other witnesses, the government asserts that Mr. Stone's testimony was not credible. It is true that there is disagreement between Mr. Stone and Petitioner as to who first blamed Mr. Gardner for the robbery. But with respect to the shooting itself, Mr. Stone's testimony is consistent with both Petitioner's testimony, and, unlike the other eyewitness testimony, much of the physical evidence. I found Mr. Stone's testimony to be credible as to the shooting over the objection of the State of Illinois.

While credibility determinations are necessarily imperfect, several factors bolster this one. Mr. Stone's claim of sole responsibility for shooting Friday Gardner has been consistent from the beginning. Two days after the shooting, when Mr. Stone was arrested, he admitted to the police that he alone shot Friday Gardner. He admitted it again on the witness stand while represented by competent counsel and for a third time before me when he testified years later at Petitioner Jones' evidentiary hearing.

Mr. Stone has consistently stated that he fired three times at Mr. Gardner with a .380 caliber pistol. Mr. Gardner's wounds were found to have been caused by two .380 caliber bullets, and three .380 caliber shell casings were found at the scene. Under the State's theory, Mr. Stone, knowing that Petitioner had in fact shot at Mr. Gardner at close range, and knowing that they had planned the shooting together, has nonetheless consistently lied for the last fifteen years to falsely take sole responsibility for the crime. This, despite the fact that Mr. Gardner's injuries showed no evidence of a close-range shooting, and despite the fact that no other shell casings were recovered.

The State further argues that the inculpating evidence adduced at trial demonstrated Petitioner's guilt. Yet of the four inculpating witnesses, only two actually claim to have seen

9

Petitioner shoot. And their testimony is at odds with the physical evidence, putting Petitioner at close range, for which there was no evidence. The third witness initially testified before a grand jury that he saw Mr. Stone come out from the alley and shoot Mr. Gardner. At trial, he denied having said this; instead, he testified he saw Petitioner with his hand in his coat pocket with what looked to him to be a gun. This witness did not see Petitioner shoot, but even if one assumes that Petitioner did shoot, it would still be similarly at odds with the physical evidence. The fourth witness testified at the evidentiary hearing that he saw Petitioner draw a gun, but did not see him fire. This fourth witness testified that he heard three shots, however, and did not see where they came from. Again, the only bullets and shell casings recovered were the three fired by a .380 caliber pistol – the type of gun Mr. Stone admitted that he used.

The State further argues, in the alternative, that even if I credit Mr. Stone's testimony, it would not exculpate Petitioner from legal responsibility for Friday Gardner's death because Petitioner was found guilty under an accountability theory under Illinois law. I disagree.

First, to be clear, at trial the government did not advance the "weaker" accountability theory it puts forth now. A review of the trial transcript reveals that the prosecutor invoked an accountability theory insofar as she asserted that, because both Petitioner and Mr. Stone fired at Mr. Gardner, it did not matter whose bullets actually killed him. In other words, at trial, the government's theory of the case consistently rested on the claim that Petitioner fired at Mr. Gardner.

Now, the government appears to argue that Petitioner Jones would have been just as guilty under an accountability theory even if he had no pistol that night, and only Mr. Stone fired at Mr. Gardner. The theory is that Petitioner, Mr. Carter, and Mr. Stone planned and acted together to retaliate against Mr. Gardner for his purported involvement in the apartment robbery.

10

The evidence that Petitioner and Mr. Stone acted together and planned Mr. Gardner's murder is too weak to work for the prosecution, particularly when Mr. Stone's testimony is taken into account. As the government notes, Petitioner and Mr. Stone discussed the robbery after it occurred. Petitioner Jones may have taunted Mr. Gardner by saying "we know you did it." Petitioner may have been involved in stealing Mr. Gardner's car radio in an attempt to get Mr. Gardner's attention. Petitioner later returned to the corner where Mr. Gardner's van was parked with Michael Carter (though separate from Michael Stone). Petitioner argued with Mr. Gardner, and Petitioner fled the scene after Mr. Gardner was shot.

These facts do not establish that Petitioner solicited, aided, abetted, agreed or attempted to aide Mr. Stone in the planning or commission of Mr. Gardner's murder with the intent to promote or facilitate such commission, as Illinois law requires. *See People v. Cooper*, 194 Ill.2d 419, 434 (Ill. 2000). When one factors in Mr. Stone's testimony taking sole responsibility for shooting Mr. Gardner because he thought Mr. Gardner was going to shoot his brother, these facts are even less convincing.

I would not find Petitioner's evidence to be so strong as to undermine my confidence in his conviction were I satisfied that he received a fair trial. But Petitioner argues that his trial was tainted by constitutional error. In Petitioner's case, the new evidence offered in support of the procedural claim of innocence is intertwined with the underlying allegation of constitutionally ineffective assistance of counsel. Petitioner's counsel is alleged to have been ineffective because he did not introduce that very "new" evidence at trial.[2]

Had this new evidence been presented at trial, there remains a substantial chance that a jury still would have found Petitioner guilty beyond a reasonable doubt. In my view, however, it

---

[2] "New" evidence need only be evidence that was not presented at trial, as opposed to evidence that was newly discovered after trial. *See Gomez v. Jaimet*, 350 F.3d 673, 679-80 (7th Cir. 2003).

11

is more likely that there is no reasonable juror who would have done so. This evidence is strong enough to undermine confidence in Petitioner's conviction unless the failure to introduce it was not constitutional error depriving Petitioner of a fair trial.

**B. Petitioner's Ineffective Assistance of Counsel Claim and § 2254(d)**

The fact that I have concluded that it is more likely than not that no reasonable juror would have convicted Petitioner were the new evidence presented at trial does not require the conclusion that his attorney's failure to present that evidence amounted to constitutionally ineffective assistance of counsel. The significance of the new evidence underlies both the procedural claim of innocence and the ineffective assistance of counsel claim, but the standards by which each claim is evaluated remain distinct.

*Strickland v. Washington*, 466 U.S. 668 (1984), established a two-pronged test that Petitioner's ineffective assistance of counsel claim must satisfy. First, Petitioner must show that his counsel's representation "fell below an objective standard of reasonableness." *Id*. at 688. Counsel's errors must be so serious that he was not "functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687. Petitioner must "overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id*. at 689.

Second, Petitioner must demonstrate that he was prejudiced by his counsel's deficient performance. This requires showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694.

Pursuant to 28 U.S.C. § 2254(d), the first inquiry before the Court is whether the state court's application of *Strickland* was unreasonable. I conclude that it was.

The bar for establishing unreasonableness in this context is quite high. *See Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("[t]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold"); *see also Murrell v. Frank*, 332 F.3d 1102, 1111 (7th Cir. 2003). But I see no reasonable explanation for counsel's decision not to introduce Mr. Stone's testimony at Petitioner's trial, and I believe it is unreasonable to conclude that Petitioner was not prejudiced as a result of that decision. The state court did not reasonably apply *Strickland* to Petitioner's claim.

With respect to the first prong, the state court of appeals identified the decision not to introduce Mr. Stone's testimony as a matter of trial tactics or strategy. *Jones*, No. 1-05-1212 at 7. The court then summarily concluded that matters of trial strategy are immune from ineffective assistance of counsel claims, noting an exception only for those instances where counsel "entirely fails to conduct any meaningful adversarial testing." *Id.* at 8.

But an attorney's decisions "are not immune from examination simply because they are deemed tactical." *U.S. ex rel. Hampton v. Leibach*, 347 F.3d 219, 249 (7th Cir. 2003). Although there is a strong presumption in the attorney's favor, a court still must determine whether the strategy could be considered sound. *See Strickland*, 466 U.S. at 689-90. Despite the presumption, decisions falling into the category of "trial strategy" are not sound per se. *See, e.g., People v. Redmond*, 341 Ill.App.3d 498, 516 (1st Dist. 2003) ("[a]lthough an attorney's decision regarding whether or not to present a particular witness is generally a matter of trial strategy, counsel may be deemed ineffective for failure to present exculpatory evidence of which he or she is aware, including the failure to call witnesses whose testimony would support an otherwise uncorroborated defense"); *People v. Skinner*, 220 Ill.App.3d 479, 485 (1st Dist. 1991) (rejecting

13

argument that counsel's decision not to call witnesses was protected as trial strategy); *see also People v. King*, 316 Ill.App.3d 901, 913 (1st Dist. 2000); *People v. Tate*, 305 Ill.App.3d 607, 612 (1st Dist. 1999); *People v. Gibson*, 244 Ill.App.3d 700, 703-04 (1993), *People v. Truly*, 230 Ill.App.3d 948, 953 (1992), *People v. O'Banner*, 215 Ill.App.3d 778, 790 (1991). The state court's routine application of *Strickland*'s first prong was insufficient.

The state court decision was an unreasonable application of *Strickland* with respect to *Strickland*'s second prong as well. The majority held that the failure to call Mr. Stone as a witness could not have prejudiced Petitioner because there was no indication that Mr. Stone would be willing to testify, and his prior testimony would have been inadmissible hearsay. But as Justice Wolfson noted in dissent:

> Whether Stone would have been willing to testify at the defendant's trial is a matter that can be sorted out at a later stage. What if he did refuse? We should not brush off the notion that his trial testimony could have been used. He would have become an unavailable witness. *See People v. Johnson*, 118 Ill. 2d. 501, 508-09 (1987). His former testimony was about the same killing Jones was charged with, and the State had ample opportunity to cross-examine him about the shooting at his trial. This is a well-recognized exception to the rule against hearsay. *See* M. Graham, Cleary & Graham's Handbook of Illinois Evidence, § 804.2 (7th ed. 1999).
>
> Certainly, Jones would have been better off had he presented Stone's testimony. Two of his witnesses testified they saw Stone fire the shots. The number of cartridges found at the scene, three, is consistent with Stone's testimony and inconsistent with the testimony of some of the State's witnesses.
>
> We should consider the contradictory nature of the State's position. The state charged Stone with firing the fatal shots. Stone admitted firing those shots, but claimed he did so in self-defense. At that trial, the State never suggested someone other than Stone fired those shots. At Jones' trial, the State's theory underwent a transformation. There, it was Jones who fired the shots, not Stone. The State had it both ways and obtained two convictions.

*Jones*, No. 1-05-1212 at 9-10 (WOLFSON, J., dissenting).

It was unreasonable to conclude simply that Petitioner was not prejudiced because Mr. Stone's testimony never would have been admitted into the record. Even assuming that Mr. Stone would have refused to testify, Petitioner had multiple grounds on which to introduce Mr. Stone's prior statements in which he took sole responsibility for shooting Mr. Gardner.

The majority also held:

> Finally, we note there were several eyewitnesses to the shooting who testified that defendant was the person arguing with the victim and the first person to draw a gun and shoot the victim, which would have diminished the effectiveness of Stone's prior testimony had it been admissible. Therefore, the outcome of the trial would not have been different had counsel attempted to present the testimony of codefendant Stone.

*Jones*, No. 1-05-1212 at 8.

This too does not follow. The eyewitness testimony was inconsistent as to whether Mr. Stone fired or Petitioner fired. But only one witness admitted under oath in his own trial that he, alone, fired three .380 bullets at the victim, consistent with the physical evidence found at the scene. That witness, Mr. Stone, was not called to testify. The fact that some conflicting eyewitness testimony would indicate that Petitioner shot the victim might "diminish the effectiveness" of Mr. Stone's testimony. But it does not then follow that "[t]herefore, the outcome of the trial would not have been different had counsel attempted to present the testimony of codefendant Stone."

Petitioner was required to demonstrate "a reasonable probability" that, had Mr. Stone's testimony been introduced, the result of the proceeding would have been different. *See Strickland*, 466 U.S. at 694. As the Supreme Court noted, this is, appropriately, a lower bar than the "more likely than not" standard. *Id*. at 693-94. In assessing such a claim, the court must consider "the totality of the evidence before the judge or jury." *Id*. at 695. The court must then ask "whether there is a reasonable probability that, absent the errors [i.e., had Mr. Stone's

15

testimony been introduced], the factfinder would have had a reasonable doubt respecting guilt. *Id.*

As the state court noted, it is true that "there were several eyewitnesses to the shooting who testified that [Petitioner] was the person arguing with the victim and the first person to draw a gun and shoot the victim." *Jones*, No. 1-05-1212 at 8. But had the state court considered the "totality" of the evidence, it would have noted that two witnesses said they saw Petitioner shoot the victim, and one witness said he saw Petitioner with what he thought was a gun in his coat pocket. It would have noted that all three of these witnesses were close friends with the victim. It would have noted that all three witnesses put Petitioner within close range of the victim at the moment of the shooting, and it would have noted that there was no physical evidence of a close-range shooting. It would have noted a police report contained a statement from this third witness taken the night of the shooting that, in contrast with his testimony at trial, he saw Mr. Stone come out from the alley and shoot the victim. It would have noted that two other witnesses testified that they did not see Petitioner shoot. It would have noted that one of these witnesses testified that Mr. Stone came out from the alley and shot the victim, and the other witness testified that she saw "someone" run out of the alley and shoot the victim. And it would have noted that the victim was found with two .380 caliber bullets in his abdomen, and that three .380 caliber shell casings were found at the scene.

Added to this evidence would have been Mr. Stone's testimony and prior statements he made to the police upon turning himself in two days after the shooting and while on the witness stand at his own trial. From the beginning, Mr. Stone admitted that he came out of the alley, and that he alone shot the victim, firing three bullets at him from a .380 caliber pistol. There is a reasonable probability that this additional evidence would have created within the factfinder a

16

reasonable doubt respecting Petitioner's guilt. In my view, it would be unreasonable to conclude otherwise. I simply cannot see any reasonable ground for competent counsel in this case to decide against offering Mr. Stone's testimony in defense or using Mr. Stone's statements against his own interests. Even if the trial judge denied admissibility, defense counsel would have had a reasonable ground for appeal.

**C. Petitioner's Ineffective Assistance of Counsel claim and § 2254(a)**

Having concluded that Petitioner has satisfied § 2254(d), the inquiry turns to whether Petitioner has established an independent violation of his constitutional rights under § 2254(a). I conclude that he has.

Again, Petitioner's claim arises under *Strickland*. With respect to *Strickland*'s first prong, Petitioner's attorney testified that he did not seek to call Mr. Stone to testify at Petitioner's trial because he had read a police report in which Mr. Stone allegedly conceded that he might not have seen a gun in Mr. Gardner's hand. The attorney had two witnesses that would testify that Mr. Gardner did pull out a gun, and he was concerned that, on cross-examination, Mr. Stone's testimony would have contradicted these other witnesses.

But the same police report also included the following:

> Stone stated that he was standing by the alley behind the building on May and that he had a .380 caliber pistol in his pocket. Stone stated that during the argument Friday pulled out a gun and began threatening Carter Cortez. Stone stated that he then went into the street where they were arguing and shot Friday with the .380.

Taking into account all of the evidence available at the time, it is not reasonable to conclude that avoiding inconsistent testimony as to whether Mr. Gardner had a gun in his hand merited omitting the rest of Mr. Stone's testimony from trial. Whether Mr. Gardner had a gun was certainly important to Mr. Stone's case – Mr. Stone asserted that he shot Mr. Gardner in defense of his brother. But it was of very limited importance to Petitioner. Its limited

17

significance is only underscored when considered with Mr. Stone's testimony that he was solely responsible for shooting Mr. Gardner, and when one takes into account the extent to which Mr. Stone's admission was consistent with the physical evidence.

This point is brought out in sharp relief by the attorney's closing argument at trial, reprinted here in its entirety:

> As I indicated in my opening statement, you are going to hear about four or five versions of what happened out there. One of the versions says that it was just Cortez Jones [Petitioner] shooting and he was shooting point blank right one inch away from the victim Friday Gardner. There is no evidence of close range firing in the protocol, no powder burns, no nothing. Also they all say that all the shooting happened away from the alley. Police Officer Cedric Taylor said he saw flashes at the mouth of the alley. He is the most credible witness we have got in this whole case. That's contradicted by all of the witnesses who say Cortez Jones did the shooting. The you have got Rene Phillips who says he shot Cortez Jones, shot through his coat. This is also contradicted by everybody else who testifies to the shooting. Then you have Anthony – strike that. Antonio Phillips who says he was point blank for the shooting. That is all contradicted by the protocol. None of the wounds had evidence of close range firing.
>
> Furthermore, Judge, this whole case is impeached by the state. They put on a case that neglected the shooter Michael Stone and you know that was their case before they prosecuted Michael Stone –
>
> [Objection from prosecutor]
>
> And he was found guilty only of committing murder, of being the shooter in this case. No mention from any of their witnesses. They did not put on witnesses. They were selective in their witnesses as to what they wanted to prove because they only wanted to convict Cortez Jones. They were so suspicious of the whole theory that the state has propounded.
>
> You heard from Michele Anderson and Latonya. They have indicated Michael Stone was the shooter which is corroborated by what Officer Tayler says. It's corroborated because Stone evidently is coming from the alley which is where Taylor sees the flashes. I submit, Judge, that there is such discrepancies between what the three state witnesses have said that you must know that half the evidence is missing that the state has presented. And that there is reasonable doubt as to whether or not Cortez Jones ever fired a gun in this case.

18

In exchange for avoiding the possibility of inconsistent testimony regarding whether Mr. Gardner drew a weapon that night (a point barely alluded to in the attorney's closing argument), the attorney gave up the ability to argue that Mr. Stone admitted to coming out from the alley with a .380 caliber weapon, that he alone shot Mr. Gardner because he thought Mr. Gardner was going to shoot his brother, that he fired with a weapon that matched the weapon used to kill Mr. Gardner, and that he did so without any previous arrangement with Petitioner. Evaluating this decision from the attorney's perspective at the time, I cannot find a path to conclude that it falls within the concededly wide range of reasonable professional assistance.

Petitioner has satisfied *Strickland*'s second prong for the reasons discussed above. Mr. Stone testified at the evidentiary hearing that he would have testified at Petitioner's trial, and that that testimony would have been consistent with his testimony at his own trial. Even if Mr. Stone had not agreed to testify at Petitioner's trial, as Justice Wolfson noted, there were multiple avenues by which Petitioner would have been able to introduce Mr. Stone's prior testimony and prior statements to the police, and there is every reason to believe the evidence would have been admitted. There is a reasonable probability that, had Mr. Stone's testimony been introduced into evidence, the factfinder would have had a reasonable doubt respecting Petitioner's guilt.

**CONCLUSION**

For the foregoing reasons, the petition for a writ of habeas corpus is granted. Respondent is directed to release Petitioner Cortez Jones within 45 days of this Order unless the State declares its intention, within those 45 days, to retry Petitioner Jones on the charges against him.

ENTER:

*James B. Zagel*

James B. Zagel
United States District Judge

DATE: September 25, 2014